**FILED**

June 03, 2026

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____Christian Rodriguez_____
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

EQUAL EMPLOYMENT OPPORTUNITY § 
COMMISSION, §
§
Plaintiff, §
§
v. §     1:23-CV-1541-RP
§
CENTRAL AUSTIN MOTORCARS LLC, §
et al., §
§
Defendants. §

## ORDER

Before the Court are Defendants Central Austin Motorcars, LLC; Hi Tech Motorcars, LLC;

and Stadium Motorcars LLC's ("Defendants") Motions for Partial Summary Judgment as to the

retaliation claims regarding Kevin Adcock, (Dkt. 75), as to claims regarding Samantha Rodriguez,

(Dkt. 98), and as to the claims regarding Silvia Rubio, (Dkt. 99), and all related briefing. Also before

the Court is Plaintiff the Equal Employment Opportunity Commission's ("EEOC") Motion for

Partial Summary Judgment, (Dkt. 100), and all related briefing. Having considered the parties'

submissions, the record, and the applicable law, the Court will deny Defendants' Motions for Partial

Summary Judgment, (Dkts. 75, 98, 99), and grant Plaintiff's Motion for Partial Summary Judgment,

(Dkt. 100).

### I. BACKGROUND

EEOC asserts that Defendants subjected a class of female workers at South Austin Nissan

to a sexually hostile work environment and committed other unlawful employment practices

prohibited by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title

VII"). (Am. Compl., Dkt. 43). Defendants' Motions seek partial summary judgment in their favor as

to EEOC's hostile work environment claims on behalf of former sales associates Silvia Rubio

1

("Rubio") and Samantha Garcia Rodriguez ("Garcia Rodriguez"), and retaliation claim on behalf of former general sales manager Kevin Adcock ("Adcock"). Rubio, Garcia Rodriguez, and Adcock (together, "the Claimants")[1] brought Title VII claims related to actions by multiple South Austin Nissan managers: Chief Operating Officer Kirk Franceschini ("Franceschini"), Finance Director Jay Torres ("Torres"), Sales Manager Tom Ochoa ("Ochoa"), General Manager Armando Tello ("Tello"), Sales Manager Andre Neito ("Neito"), and Used Car Sales Director Mike Hernandez ("Hernandez"). (Resp., Dkt. 101, at 3; Resp., Dkt. 108, at 1; Resp., Dkt. 109, at 2).

Also, in its Motion for Partial Summary Judgment, EEOC asserts that there is no genuine dispute of material fact that for purposes of Title VII liability and remedies, the three Defendants operated together as a single statutory "employer" (i.e., an "integrated enterprise") within the meaning of 42 U.S.C. § 2000e(b): in other words, that the three Defendants were functionally integrated and operated as a single statutory employer of the Claimants while they were employed at South Austin Nissan. (*See generally* Mot. for Partial Summ. J. ("Mot."), Dkt. 100).

Turning first to the hostile work environment claims, EEOC cites record evidence of the following facts, among others. As to Rubio, EEOC cites record evidence that Torres slapped her hard on her buttocks in August 2021, (Resp., Dkt. 108, at 2); that Ochoa banged on her desk and exclaimed, "that is how me and my girl sound in the bedroom, (*id.* at 2−3); and that Hernandez instructed her to display parts of her body to make more sales (i.e., to "show more, sell more"), (*id.* at 3−4), frequently made comments about her sexual attractiveness, (*id.* at 4), and grabbed her face and cheeks regularly, (*id.* at 5). Rubio reported the instance of Torres slapping her to Adcock. (*Id.* at 2). Rubio also changed the way she dressed after Hernandez made near-daily comments to her about her body and physical appearance; those comments made her very uncomfortable. (*Id.* at 4). Rubio

---

[1] The EEOC also filed suit on behalf of claimants Melissa Hess and Mireya Sanchez, (Am. Compl., Dkt. 43, at 1), and Defendants did not move for summary judgment about those claimants, so their claims are not addressed in this Order.

also reported these instances to Owner Loyalty Manager Dayna Bedell ("Bedell"). (*Id.*). After Rubio made the complaints to Bedell, Hernandez called her a "snitch," and refused to work with her on used car deals, which meant she was required to visit another location to work with a different manager to finalize sales; as a result of Hernandez's refusal to work together, Rubio could complete fewer used car sales. (*Id.* at 5–6). Rubio ultimately left South Austin Nissan because the sexual harassment was unbearable. (*Id.* at 6).

As to Garcia Rodriguez, EEOC cites record evidence that Tello and Hernandez told her to pull her shirt down or unbutton her shirt to show cleavage to sell more cars, (Resp., Dkt. 109, at 2), that Tello put his face close to her cheek and growled in her ear, that Hernandez twice invited Garcia Rodriguez to drinks one-on-one after work despite her being under legal drinking age and engaged, and that both Tello and Hernandez referred to Garcia Rodriguez by demeaning, belittling nicknames, which they did not do to male employees, (*id.* at 3). So too, EEOC cites record evidence that Hernandez touched Garcia Rodriguez against her wishes, including touching her hair and cheeks on different occasions. (*Id.* at 5–6). The unwanted touching caused Rodriguez to fear instances where she needed to go on a test drive one-on-one with Hernandez. (*Id.* at 6).

As to the retaliation claim concerning Adcock, EEOC cites record evidence that while Adcock served as supervisor to the sales associates, Adcock learned from Rubio that Torres had slapped her on the buttocks, and reported Torres to Human Resources Director Sylinda Kenyon ("Kenyon"). (Resp., Dkt. 101, at 3). After finding out Adcock reported the incident, Franceschini called him a "stupid motherfucker," told him "we keep our dirty laundry in the house," and instructed him to not report sexual harassment in the future and never report it in writing. (*Id.*). EEOC also cites record evidence that Franceschini interfered with reports of sexual harassment by calling Kenyon, screaming at her for her efforts to terminate Torres's employment, and overriding Torres's termination. (*Id.*). EEOC cites record evidence that Adcock also reported several instances

3

of harassment to Franceschini directly. (*Id.* at 4). Specifically, Adcock reported Tello and Neito for sexual harassment in the form of making comments about sales associate Melissa Hess's ("Hess") appearance and sexual relationships, and reported Tello for touching sales associate Mireya Sanchez ("Sanchez") and telling her that she looked "sexy" and "hot." (*Id.* at 3−4). Because Franceschini did not inform Kenyon or human resources of the complaints, Adcock reported directly to Kenyon in writing in April 2022. (*Id.* at 5). In May 2022, Tello assaulted Sanchez by pinning her between a wall and a printer, which Adcock also reported to Kenyon and Franceschini. (*Id.*). In June 2022, Adcock reported Ochoa for sexual harassment after complaints that Ochoa announced to a group of sales associates that women are "only good for one thing and that's sucking a man's dick." (*Id.*). Franceschini responded to Adcock's report by saying, "he's got a point there." (*Id.*).

In July 2022, Sanchez filed a discrimination charge with the EEOC, and Adcock became a witness in the resulting investigation. (*Id.* at 6). Around that time, in September 2022, Franceschini transferred Adcock to the Maserati of Austin. (*Id.*). At the Maserati dealership, a manager would typically be put on a pay plan; however, Adcock never obtained a pay plan, meaning he did not receive commissions on his sales and his take home pay decreased by over one half. (*Id.* at 7). Franceschini fired Adcock in January 2023 referencing that he was "not a good fit," according to EEOC. (*Id.* at 8). By contrast, Defendants argue that Franceschini fired Adcock for deficits in his sales performance, citing record evidence of reduced sales. (Mot., Dkt. 75, at 13).

## II. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party

might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin All. v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000).

### III. DISCUSSION

#### A.  Hostile Work Environment Claims as to Rubio and Garcia Rodriguez

To establish a prima facie case of hostile work environment under Title VII, EEOC must show that (1) each Claimant (i.e., Rubio and Garcia Rodriguez) belongs to a protected class; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; and (4) the

harassment affected a term, condition, or privilege of employment. *EEOC v. Boh Bros. Constr. Co., L.L.C.*, 731 F.3d 444, 453 (5th Cir. 2013). Defendants do not contest that Rubio and Garcia Rodriguez belong to a protected class nor that either was subject to unwelcome harassment. As such, the Court turns to the remaining prongs.

First, a reasonable juror could find that the harassing conduct toward Garcia Rodriguez and Rubio was based on sex. The harassment need not reference sexual desire or overtly reference sex or gender so long as it is sex-motivated, i.e., it would not have occurred but-for the victim's sex, a fact that can be reasonably inferred from the surrounding circumstances, such as other acts of harassment that are more overtly sex-based. *See, e.g., Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998); *LiVolsi v. Univ. of Texas at Austin*, No. 1:24 CV-127-RP, 2024 WL 4849060, at *4 (W.D. Tex. Nov. 15, 2024) ("[A] fact finder may conclude incidents that are less clearly related to the plaintiff's protected class are indeed related in the context of other incidents more closely connected to the protected characteristic."). The Court finds that a jury could conclude that the conduct against Garcia Rodriguez and Rubio, especially in context of the surrounding circumstances (which included repeated unwanted intimate touching and threatening contact, comments about their appearances and bodies, demeaning nicknames, and directing them to be dress differently to make more sales, among other allegations) was based on sex.

Second, a reasonable jury could find that the harassment affected a term, condition, or privilege of employment of Rubio and Garcia Rodriguez. To affect a term, condition, or privilege of employment, the harassing conduct "must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Sanders v. Christus Santa Rosa PASC*, 995 F. Supp. 2d 626, 632 (W.D. Tex. Jan 17, 2014); *Aryain v. Wal–Mart Stores of Tex., LP*, 534 F.3d 473, 479 (5th Cir. 2008)). The work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the

victim in fact did perceive to be so." *Aryain*, 534 F.3d at 479. Determining whether a hostile-work environment exists takes into account the totality of the circumstances, including such factors as: (1) the frequency of the conduct; (2) its severity; (3) the degree to which the conduct is physically threatening or humiliating; and (4) the degree to which the conduct unreasonably interferes with an employee's work performance. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). The Court considers the "cumulative effect" of separate incidents, in the context of the overall work environment, not "disaggregat[ed] claims." *Donaldson v. CDB Inc.*, 335 F. App'x 494, 503 (5th Cir. 2009); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002) ("[T]he incidents constituting a hostile work environment claim are part of one unlawful employment practice" and "the employer may be liable for all acts that are part of this single claim."). The analysis of a hostile-work environment also considers "harassment by all perpetrators combined." *Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999); *see also, e.g., Conner v. Schrader-Bridgeport Intern., Inc.*, 227 F.3d 179, 193−94 (4th Cir. 2000).

Considering the overall record, the Court finds a material dispute of fact as to the EEOC's hostile-work environment claim. A jury could reasonably conclude that Rubio and Garcia Rodriguez experienced a hostile work environment based on the type of conduct in the record, including: multiple instances of unwanted intimate touching, threatening and humiliating behavior (such as growling, slapping, and pinching), and frequent comments made about sex and about their appearances and bodies, as described above. *See, e.g., Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 401−02 (5th Cir. 2013) (reversing grant of summary judgment to employer, noting two men sniffing and hovering over woman in an office space and saying "I need a release" "can certainly be seen as 'physically threatening,' [and] 'humiliating'"); *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005) ("Undoubtedly, the deliberate and unwanted touching of [an employee's] intimate body parts can constitute severe sexual harassment."); *Schexnayder v. Bonfiglio*, 167 F. App'x

364 (5th Cir. 2006) (upholding jury verdict finding hostile work environment where managers made sexual advancements and touched a female employee's while she was bent over); *La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 480−81 (5th Cir. 2002) (finding a genuine issue of material fact exists as to hostile work environment where harasser intimately touched an employee, spit at employee, and commented on employee's sexuality); *Jackson v. Mgmt. & Training Corp., No.* 4:23-CV-00066-MPM-JMV, 2024 WL 3352446, at \*6 (N.D. Miss. July 8, 2024) (denying summary judgment where harasser made regular remarks about employee's clothing, told sexual stories, and touched her hand and hair, among other conduct).

The social context—that this harassment was from supervisors who held authority over Claimants within the workplace—also underscores that a jury could reasonably find they experienced a hostile work environment. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998) ("[A] supervisor's power and authority invests his or her harassing conduct with a particular threatening character."). The frequency of comments made about both Claimants' appearances also underscores that the harassment may be found pervasive. *See Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 806 (5th Cir. 1996) (holding two or three offensive comments per week over six month period was severe and pervasive harassment creating a hostile work environment); *Lynch v. Texas Comm'n on Env't Quality*, No. 6:09CV309, 2010 WL 11530713, at \*2 (E.D. Tex. July 4, 2010) (finding a genuine issue of material fact existed as to if sex harassment was severe or pervasive when harassing comments were made "almost daily"). Finally, both Claimants testified that they found the actions subjectively hostile and abusive, and tried to report it, which supports the existence of a hostile work environment. *See, e.g., Wallace v. Performance Contractors, Inc.*, 57 F.4th 209, 223 (5th Cir. 2023); *Suarez v. Nueces Cnty., Tex.*, No. CIV.A. C-08-217, 2009 WL 1839000, at \*8 (S.D. Tex. June 24, 2009). Contrary to Defendants' arguments, the Court need not overdo the analysis of each individual incident of sexual harassment against Rubio and Garcia Rodriguez, or the actions of each individual

8

supervisor, in light of the authorities described above, which make clear that the factfinder is to consider the *totality* of the evidence and the *overall* work environment. Summary judgment is not warranted on Garcia Rodriguez and Rubio's hostile-work environment claims.

Summary judgment is also not warranted on the grounds that Defendants exercised reasonable care to prevent and correct harassing behavior. Under *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998), Defendants are entitled to a defense from liability if they show that "(1) the employer exercised reasonable care to prevent and correct promptly any harassing behavior and (2) the plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities that the employer provided." *Boh Bros. Constr. Co., L.L.C.*, 731 F.3d at 462 (the "*Faragher/Ellerth* defense"). In order to succeed on the *Faragher/Ellerth* defense at this stage, "an employer must establish both of the essential elements by a preponderance of the evidence." *Rodriguez v. City of Houston*, 250 F. Supp. 2d 691, 704 (S.D. Tex. 2003). Further, a supervisor's tangible employment action forecloses the affirmative defense. *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 388 (5th Cir. 2003). A "tangible employment action constitutes a significant change in employment status, such as . . . a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.

In the case of Rubio, a reasonable juror could conclude that Hernandez's refusal to approve her car sales, as described above, constituted a "tangible employment action" because it prevented her from working on deals as quickly and required her to visit other locations to complete her deals. *See Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1229 (10th Cir. 2000) (holding a tangible employment action occurred where supervisor withheld leads and disapproved loans from commission-based employees); *Sarantis v. ADP, Inc.*, No. CV-06-2153PHXDGC, 2008 WL 1776508, at *8 (D. Ariz. Apr. 15, 2008) (finding a genuine dispute of material fact as to a tangible employment action where employee's "clients were removed and her workload adjusted"). A jury could therefore

9

reasonably conclude that the *Faragher/Ellerth* affirmative defense is unavailable to Defendants as to Rubio, and summary judgment must be denied as to Rubio's claims as a result.

As to Garcia Rodriguez, the Court finds that Defendants have not established that they are entitled to summary judgment on their *Faragher/Ellerth* affirmative defense because they have not established that she unreasonably failed to complain about the harassment. Rather, EEOC cites record evidence that Garcia Rodriguez complained to both Bedell and Adcock. (Resp., Dkt. 109, at 4, 7). A reasonable jury could conclude that it was not unreasonable for Garcia Rodriguez not to make further complaints after Defendants did not take action in response to those earlier complaints, because when it "becomes objectively obvious that the employer has no real intention of stopping the harassment, the harassed employee is not obliged to go through the wasted motion of reporting the harassment." *Woods v. Delta Beverage Grp., Inc.*, 274 F.3d 295, 301 (5th Cir. 2001). EEOC cites record evidence that even Kenyon, in Human Resources, likewise believed reporting the conduct would be futile. (Resp., Dkt. 109, at 20−21). Therefore, Defendants cannot establish that they are entitled to the *Faragher/Ellerth* affirmative defense as a matter of law as to Garcia Rodriguez.

Finally, Defendants seek summary judgment on the grounds that Rubio and Garcia Rodriguez submitted declarations which "embellish" each Claimant's previous deposition testimony. (Reply, Dkt. 109, at 2; Reply, Dkt. 111 at 3−5). However, Defendants fail to identify ways in which either Rubio or Garcia Rodriguez's declaration contradicts her testimony, arguing only that the declaration is a "supplement" or an "expansion" to prior testimony. (Reply, Dkt. 110, at 2−4; Reply, Dkt. 111, at 4−5). But an affidavit that "supplements rather than contradicts prior deposition testimony" may properly be considered as competent summary judgment evidence. *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 1996); *Winzer v. Kaufman Cnty.*, 916 F.3d 464, 472 (5th Cir.

2019). The credibility of each Claimant's testimony is a question for the factfinder; the Court declines to grant summary judgment on this basis.

### B.  Retaliation Claim as to Adcock

Title VII's anti-retaliation provision prohibits an employer from "discriminat[ing] against" an employee "because he has opposed any practice made an unlawful employment practice" by Title VII or "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). A claimant must first establish a prima facie case of retaliation by showing that (1) he engaged in a protected activity, (2) an adverse employment action occurred, and (3) a causal link existed between the protected activity and the adverse employment action. *Hernandez v. Metro. Transit Auth. of Harris Cnty.*, 673 F. App'x 414, 419 (5th Cir. 2016). An employee engages in a protected activity by (1) opposing an employment practice made unlawful by Title VII, or (2) by making a charge or testifying, assisting, or participating in an investigation, proceeding, or hearing under Title VII. *See Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996) (quoting 42 U.S.C. § 2000e-3(a)). The underlying practice need not actually be illegal, but the employee must at least reasonably believe that it is. *See id.* The employee is required to show that he would not have suffered the adverse employment action but-for the protected activity. *See Strong v. Univ. Health Care Sys.*, 482 F.3d 802, 806 (5th Cir. 2007). Once the employee meets his initial burden, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). If the employer proffers a legitimate, nondiscriminatory reason, the burden then returns to the employee to prove that the employer's reason is pretext for unlawful discrimination. *See Septimus v. Univ. of Hous.*, 399 F.3d 601, 607 (5th Cir. 2005).

Defendants do not dispute that Adcock engaged in protected activity, nor that his discharge was an adverse employment action. The Court therefore turns to the issues raised in their Motion:

(1) whether the transfer was an adverse employment action; (2) whether there is sufficient evidence of retaliatory motivation or temporal proximity between the protected activity and the transfer or discharge to support retaliation being the but-for cause of either; and (3) whether EEOC has cited sufficient evidence that the alleged reason for Adcock's termination and transfer is pretextual. (Reply, Dkt. 75, at 1−3).

Turning first to whether Adcock's transfer was an adverse action, a reasonable factfinder could conclude that it was. An employment action is materially adverse if it "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 58 (2006) (internal quotation marks omitted). A transfer may constitute a retaliatory adverse action, depending on the circumstances. *See Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 485 (5th Cir. 2008) (noting even a "lateral reassignment to a position with equal pay could amount to a materially adverse action in some circumstances"). EEOC cites record evidence that Adcock's transfer resulted in less compensation for his work by more than one-half because after transfer, he did not receive a new pay plan in a timely manner. (Resp., Dkt. 101, at 7). Courts in this Circuit have held that smaller pay decreases than this raised a factual issue as to whether the action was adverse. *Magna v. Coleman World Group LLC,* No. EP-16-CV-196-DB, 2017 WL 3841887 at *9 (W.D. Tex. Aug. 31, 2017) (finding material dispute of fact on this prong where plaintiff's average weekly wage decreased by a smaller proportion). Further, EEOC cites record evidence that Adcock's new position at the Maserati of Austin increased his commute by about 45 minutes and involved more supervisory responsibilities. (*Id.* at 6−7). That a new position requires completing more work can also mean that a transfer constitutes an adverse employment action. *Johnson v. Watkins*, 803 F. Supp. 2d 561, 574 (S.D. Miss. 2011), aff'd, 472 F. App'x 330 (5th Cir. 2012). Even if Adcock was at first excited about the transfer, as Defendants argue, (Mot., Dkt. 75, at 6), this fact does not prevent a jury from reasonably finding that it was ultimately an adverse action, especially

after the subsequent issues receiving his pay plan. Defendant's arguments on this point go to the strength of the evidence supporting a finding that Adcock experienced a retaliatory act, not to the existence of a material fact dispute.

Turning next to evidence of retaliatory motive, the Court finds that EEOC has raised a material dispute of fact on this ground. Specifically, EEOC cites evidence that Franceschini responded with vitriol to Adcock after he reported sexual harassment, directed him not to report it in the future, and also acted angrily to Kenyon when she attempted to act on Adcock's complaint. Franceschini cursed and yelled at Adcock, calling him a "stupid motherfucker," when Adcock reported sexual harassment. (Resp., Dkt. 101, at 11). This hostile reaction could reasonably be found to support the existence of a retaliatory motivation for Adcock's transfer and discharge. *Jones v. Griffin*, No. CIV.A. H-04-4719, 2006 WL 2253133, at *3 (S.D. Tex. Aug. 3, 2006) ("An employer's hostile reaction to a discrimination complaint may be probative of a retaliatory motive."). That Adcock proceeded to report instances of sexual harassment repeatedly, after Franceschini's directive not to do so, also supports an inference of retaliatory intent on Franceschini's part. *See, e.g., Awe v. Harris Health Sys.*, 163 F.4th 969, 974 (5th Cir. 2026).

So too, an atmosphere of condoned sexual harassment increases the likelihood of retaliation and is probative of retaliatory animus. *See, e.g., Quinn v. Consolidated Freightways Corp.*, 283 F.3d 572, 579 (3d Cir. 2002); *Hawkins v. Hennepin Technical Ctr.*, 900 F.2d 153, 155−56 (8th Cir. 1990) ("[A]n atmosphere of condoned sexual harassment in a workplace increases the likelihood of retaliation for complaints in individual cases."). EEOC cites evidence that Franceschini condoned acts of sexual harassment, for instance when he stated that he agreed with Ochoa's comment that women are "only good for one thing and that's sucking a man's dick." (Resp., Dkt. 101, at 5). Record evidence that Franceschini (1) sought to interfere with Kenyon's attempts to act against Torres after he slapped an employee in the buttocks, and (2) instructed Adcock not to report sexual harassment

13

complaints, as described above, could also be found to support an inference that Franceschini condoned this behavior. In sum, a reasonable jury could find that retaliation was a but-for cause for Adcock's adverse employment action.

Defendants argue that Adcock's termination was not close in time enough to his protected activity to raise an inference of retaliation. (Mot., Dkt. 75, at 9. In some instances, the close temporal proximity between the action and retaliation can suffice to establish a claimant's prima facie case of retaliation. *See, e.g., Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 578 (5th Cir. 2020), as revised (Aug. 14, 2020) (holding "approximately six-to-seven-week gap" sufficient to establish prima facie case). However, having found that other evidence exists of retaliatory motive for Adcock's transfer, the Court need not rely on a close-in-time temporal proximity alone. *See Harmon v. Collier*, 158 F.4th 595, 615 (5th Cir. 2025) (holding additional factors "make a seven-month temporal gap sufficient for a reasonable jury to conclude there was retaliation."). Regardless, the Fifth Circuit has measured temporal proximity from an employee's most recent protected activity. *See Shahrashoob v. Texas A&M Univ.*, No. CV H-22-699, 2023 WL 8238192, at *6 (S.D. Tex. Nov. 28, 2023), aff'd, 125 F.4th 641 (5th Cir. 2025) (establishing temporal proximity by measuring from protected activity in July and August of 2020, despite prior protected activity in March 2020); *January v. City of Huntsville*, 74 F.4th 646, 653 (5th Cir. 2023) (measuring temporal proximity between plaintiff's "second protected activity and his firing"). EEOC cites record evidence that Adcock's most recent protected activity was when he reported Ochoa to Franceschini via text message in August 2022, seven weeks prior to his transfer, and two and a half weeks before Franceschini informed Adcock of the transfer. (Resp., Dkt. 101, at 17). The most recent protected activity was also about five months before Franceschini terminated Adcock, which, in context, can also support finding retaliation. *Harmon*, 158 F.4th at 615 (finding retaliation with seven month gap). Under the authorities above, that timeframe could

support an inference of retaliation, especially in context of the direct evidence of retaliatory motive described above.

Turning to pretext, for the same reason the Court finds that a genuine dispute of material facts exists as to retaliatory motive, the Court finds that the same evidence could reasonably support a conclusion by a factfinder that the alleged reasons for transferring and firing Adcock are pretextual. At this stage, "the question is not whether the plaintiff proves pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext." *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) (citing *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 646 (5th Cir. 1985)). Defendants argue that Adcock was transferred and later fired because his sales dropped (both before and after his departure from Central Austin Nissan) to an unacceptable level. (Reply, Dkt. 104, at 2). EEOC rebuts this reasoning by pointing to record evidence that Adcock's performance was not cited as a reason for either his transfer or termination at the time. (Resp., Dkt. 101, at 8). EEOC also cites evidence that Adcock would typically not have been evaluated for his performance by individual car sales, because his job responsibilities involved supervising sales associates, rather than requiring him to sell cars as an individual. (*Id.* at 15−16). The Fifth Circuit has held that holding an employee to "previously unmentioned" job requirements can raise a "genuine issue of material fact as to pretext." *Moss v. BMC Software, Inc.*, 610 F.3d 917, 926 (5th Cir. 2010). Here, EEOC has cited facts sufficient to raise a material dispute of fact because having a high rate of car sales was either not mentioned as a requirement at the time of Adcock's employment or was not actually a requirement of Adcock's role—either of which could support a reasonable inference of pretext.

Further, EEOC cites record evidence that when Franceschini fired Adcock, he did not cite job performance issues but said that Adcock was "not a good fit." (Resp., Dkt. 101, at 8). That this statement is vague supports the notion that Adcock's firing may have been pretextual. *See, e.g.,*

15

*Stennett v. Tupelo Pub. Sch. Dist.*, 619 F. App'x 310, 322 (5th Cir. 2015) (subjective reasons for employment decisions "provide opportunities for unlawful discrimination"') (quoting *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 681 (5th Cir. 2001)); *Glenn v. P1 Grp., Inc.*, No. 22-2121-JWB, 2023 WL 3019661, at *7 (D. Kan. Apr. 20, 2023) (holding that, when at the time of termination, the decisionmaker explained the termination was because the employee was not a "good fit" is evidence of pretext because it "is vague" and that subsequent proffered evidence of poor performance is mere "post hoc justification."). In sum, EEOC has shown a material dispute of fact as to pretext in response to Defendants' cited reasons for the adverse actions against Adcock. Summary judgment on Adcock's retaliation claim is not warranted.

### C.  EEOC's Motion for Partial Summary Judgment

EEOC seeks summary judgment on its argument that Defendants operated together as a single statutory "employer" (i.e., an "integrated enterprise") within the meaning of 42 U.S.C. § 2000e(b). (Mot., Dkt. 100, at 1). The Fifth Circuit applies a four-factor test to determine whether nominally distinct entities are in fact integrated as a single employer for Title VII purposes. *Trevino v. Celanese Corp.*, 701 F.2d 397 (5th Cir. 1983). That test considers the "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Id.* at 404. EEOC argues that Defendants operate several car dealerships collectively, including South Austin Nissan (where Claimants and the managers accused of sexual harassment worked), Central Houston Nissan (from which Defendants controlled human resources), and additional dealerships where Defendants transferred employees. (Mot., Dkt. 100, at 2).

At issue in a Title VII case is the claimants' employment relationship with the Defendants. *Perry v. VHS San Antonio, L.L.C.*, 990 F.3d 918, 926 (5th Cir. 2021) (citing *Muhammad v. Dall. Cnty. Cmty. Supervision & Corr. Dep't*, 479 F.3d 377, 380 (5th Cir. 2007)). "The term 'employer' as used in

Title VII of the Civil Rights Act was meant to be liberally construed." *Trevino*, 701 F.2d at 404. An employment relationship can exist between an employee and multiple "superficially distinct entities" when those entities constitute an integrated enterprise, thus exposing each of those entities to liability. *Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761, 763 (5th Cir. 1997).

To the first *Trevino* factor, EEOC cites record evidence of a high degree of interrelated operations. This factor focuses on whether "one entity excessively influenced or interfered with the business operations of the other." *Perry*, 990 F.3d at 927 (internal quotations omitted). Factors that show interrelated operations include (among others): evidence of shared employees, commingled inventory, involvement in one another's decisions related to marketing and advertising, issuance of paychecks on one another's behalf, filing or preparing a tax return on one's behalf, and shared maintenance of records. *Id.* Using a logo or letterhead interchangeably can also support finding interrelated operations. *See EEOC v. Dolphin Cruise Line, Inc.,* 945 F. Supp. 1550, 1554 (S.D. Fla. 1996). So can sharing a common principal address. *See EEOC v. Care Ctrs. Mgmt. Consulting, Inc.*, 942 F. Supp. 2d 771, 779 (E.D. Tenn. 2013). Defendants refer to their Houston area dealerships (including Central Houston Nissan, Central Houston Cadillac, and South Houston Nissan) as "Central Automotive Group", and their Austin area dealerships, (South Austin Nissan, Maserati of Austin, and others), as "Hi Tech Motorcars" (collectively, the "Weitz Dealerships").[2] (*Id.* at 2−3). All of Defendants' dealerships share a common corporate office in Houston. (*Id.* at 5). From the Houston office, the dealerships' shared CFO oversaw the preparation of tax returns for the dealerships. (*Id.* at 14). The Weitz dealerships also contract collectively, maintaining group health insurance and a 401(k) plan for the employees across Austin dealerships and across Houston dealerships. (*Id.* at 5−6). The dealerships share marketing software purchased in one agreement by "Weitz Auto Group." (*Id.* at 6). The dealerships also share inventory, transferring used vehicles

---

[2] As discussed below, all of the dealerships are owned in part or in whole by the Weitz family.

between themselves at cost. (*Id.*). Further, the dealerships transferred employees (including accused

managers Nieto and Tello and Claimants Hess and Adcock) between them. (*Id.* at 7). The Weitz

dealerships also operated two websites, one for Central Automotive Group (in Houston) and one

for Hi Tech Motorcars (in Austin). (*Id.*). Hi Tech Motorcars refers to itself as "an automotive dealer

group that owns franchises throughout Texas" on its LinkedIn page. (*Id.*). Considering the caselaw

described above, these facts show a high degree of interrelation between the dealerships' operations.

Defendants' arguments focus on the fact that each dealership within the group[3] has a

separate legal entity; (Resp., Dkt. 107, at 11), and that Defendants do not "transfer" but rather hire

and fire employees between dealerships, re-filing paperwork to re-hire them, (*id.* at 12). As an initial

matter, the caselaw described above contemplates *separate* legal entities constituting an overlapping

enterprise; merely having separate LLCs does not suffice to preclude finding integrated operations.

Defendants' arguments about transfer are belied by the record evidence in this case about the

transfer of Adcock and other individuals by Franceschini. Indeed, elsewhere, Defendants argue that

Franceschini "promoted" Adcock when he moved him from the South Austin Nissan to the

Maserati dealership, a decision Defendants characterize as having been made in Franceschini's

judgment because he believed "it would be a win/win" for the Maserati dealership and for Adcock.

(Mot., Dkt. 75, at 3−4). Defendants' discussion of Adcock's transfer does not, by contrast, suggest

that Adcock was fired by South Austin Nissan and re-hired by the Maserati of Austin in successive,

independent decisions, but rather characterizes these decisions as a "promotion" decision made by

Franceschini while exercising management across both dealerships. (*Id.*). Defendants' own personnel

action form also includes "transfer" as an option of a personnel action. (Reply, Dkt. 115, at 4).

Defendants also suggest that relying on shared insurance is "unremarkable" and note that there are

---

[3] Defendants refer to themselves as a "multi-location dealership group," (Resp., Dkt. 107, at 2), which is consistent with EEOC's position that they are an integrated enterprise.

in fact separate new hire checklists at dealerships at the Hi Tech Auto Group and at the Central Auto Group. (*Id.* at 12). They also call the similarity in management across Central Automotive Group and Hi Tech Motorcars reflective of a "regional structure" and not a "total merger." (*Id.* at 12). These arguments do not raise a material dispute of fact in response to the evidence on interrelated operations submitted by EEOC; again, the test described above does not require a total merger of operations but rather integrated operations for employment purposes, which EEOC has shown.

To the second factor, EEOC cites record evidence of a high degree of centrally controlled labor relations. Evidence of centralized labor and employment decisions can include control of hiring, firing, promoting, paying, transferring, or supervising employees of the subsidiary. *EEOC v. Modern Group Ltd.*, 725 F.Supp.3d 577, 597 (E.D. Tex Mar. 25, 2024). Reporting to "to common authority figures . . . authorized to take some employment action" also "suggests the companies are an integrated enterprise." *EEOC v. R&L Carriers, Inc.*, 664 F. Supp. 3d 784, 799 (S.D. Ohio 2023) (internal quotation marks and citations omitted); *see also Leggett v. Mac Haik Ford, Ltd.*, 1:21-cv-789-SH, 2024 WL 3488127, at *4 (W.D. Tex. July 19, 2024) (same, when a parent employer had responsibility to make "final" decision to terminate an employee). That one entity maintains all defendants' personnel records is also probative of centralized control of labor relations. *See Dolphin Cruise Line, Inc.,* 945 F. Supp. at 1554 (finding evidence of centralized control of labor relations where one entity maintained all defendants' personnel records). EEOC cites record evidence that Human Resources for the Weitz dealerships was administered centrally by Kenyon during the relevant period, including managing payroll, health insurance, FMLA administration, and worker's compensation insurance. (Mot., Dkt. 100, at 8). Kenyon worked at Stadium Motorcars LLC and received her pay from them. (*Id.*). Personnel files were maintained at Stadium for all employees across dealerships. (*Id.* at 9). Stadium would also be required to review the termination of employees

19

across dealerships. (*Id.* at 15). Direct deposit forms, employment applications, and employee policy acknowledgments were promulgated by Stadium and used interchangeably between the dealerships in Austin. (*Id.* at 9). Stadium also maintained a common employee handbook and anti-discrimination and anti-harassment policies for both Central Automotive Group and Hi Tech Motorcars. (*Id.* at 9). Defendants' witness also testified that Stadium handled the sexual harassment complaints in this case. (*Id.* at 9−10). Human Resources staff identified themselves in their email signatures as working with both Central Automotive Group and Hi Tech Motorcars. (*Id.* at 8). Job postings were also with Central Automotive Group or Hi Tech Motorcars, not with individual dealerships. (*Id.*). A single employment liability insurance policy insured all employees at the Weitz dealerships, despite only "Hi Tech Motorcars" being an applicant and insured on this policy. (*Id.*). In its application for EPLI insurance, Hi Tech Motorcars identifies itself as the employer of all 700 of the Weitz dealerships' employees. (*Id.*). The National Labor Relations Board resolved a charge with Hi Tech Motorcars, LLC collectively as a "single employer" in 2022. (*Id.* at 10). All of these pieces of evidence support the finding of centrally controlled labor relations.

On this factor, Defendants point to evidence that Franceschini would only be involved in "high level" operations, gave "COO-level oversight," and was "not typically involved" in sexual harassment investigations. (Resp., Dkt. 107, at 13). That does not suffice to create a genuine dispute of material fact because EEOC relies on multiple other examples of centrally controlled labor operations, which Defendants do not contest. Defendants also argue that Human Resources would have handled termination decisions and not Franceschini, but this is consistent with EEOC's argument that Human Resources was shared across the Weitz dealerships, as described above. (*Id.* at 13). Defendants point to the fact that when applying for EPLI insurance, Defendants "separately identified" the properties to the insurance company, but that does not undercut the weight of holding multiple shared insurance policies under this factor. (*Id.* at 14). In sum, even accepting as

true Defendants' arguments on this factor, Defendants have not demonstrated a material dispute of fact that the second factor weighs in favor of finding an integrated enterprise.

To the third factor, common management, the record also shows that Defendants shared top managers. This factor focuses on "whether the entities have common officers, directors, and managers." *EEOC v. SDI of Mineola, L.L.C.*, 6:21-CV-00226-JCB-KNM, 2022 WL 4127167, *12 (N.D. Tex. Aug. 17, 2022). Until 2023, Ricardo Weitz was the president and managing member of each dealership, including Defendants. (*Id.* at 5). Paul Weitz, his son, assumed that role in 2023. (*Id.*). Candido Pagan is the vice president for each dealership and serves as the Chief Financial Officer for the Weitz dealerships. (*Id.* at 4). Kirk Franceschini is Chief Operating Officer responsible for operations across Austin dealerships, supervising the dealerships' respective General Managers. (*Id.* at 5). In deposition testimony, Franceschini referred to himself as the CEO of Central Automotive Group. (*Id.*). Defendants refer to Weitz and Pagan's positions as "governance positions," overseeing operations from a "high level," but this does not suffice to create a material dispute of fact because the existence of shared management is undisputed. (Resp., Dkt. 107, at 15). Defendants emphasize that these high-level managers did not handle "day-to-day financial operations of each individual dealership," (*id.*), but nothing suggests all day-to-day managerial decisions must be handled by the same people across entities to find an integrated enterprise for Title VII purposes. Given that Defendants admit that the dealerships shared these common high-level managers, the third factor also weighs in favor of finding an integrated common enterprise.

Turning to the degree of common ownership and financial control (the fourth factor), an integrated enterprise may exist when companies are owned by the same family with the same individuals serving as officers. *Modern Group*, 745 F. Supp. 3d at 598. South Austin Nissan is owned by members of the Weitz family, via a trust which owns and operates more than a dozen automotive dealerships. (Mot., Dkt. 100, at 2). The Weitz family trust actively operates each dealership and owns

21

(in whole or in part) Defendant Central Austin Motorcars, LLC, Defendant Stadium Motorcars, LLC, and Defendant High Tech Motors, LLC. (*Id.*). The dealerships also share two overlapping "silent partners" who hold an ownership interest in each dealership and who own Defendant Stadium Motorcars, LLC in part. (*Id.* at 3). Defendants argue that the ownership of each Defendant is not identical, but Defendants identify no material dispute of fact on the point that the ownership is highly overlapping. Having considered all four *Trevino* factors, the Court finds that summary judgment as to Defendants constituting a single, integrated enterprise for Title VII purposes is warranted, and the Court will grant EEOC's Motion for Partial Summary Judgment, (Dkt. 100).

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that Defendants' Motions for Summary Judgment, (Dkt. 75, 98, 99), are **DENIED** and that Plaintiff's Motion for Partial Summary Judgment, (Dkt. 100), is **GRANTED**.

**IT IS FURTHER ORDERED** that because this Order relies on information that this Court has maintained under seal, that the Clerk of the Court file the Order under seal. The parties are directed to propose any redactions to this Order to maintained the sealed status of that information on or before **June 17, 2026**. The Court will then file a redacted, public version of this Order based on the parties' joint proposal.

**SIGNED** on June 3, 2026.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

22